HEARD NOVEMBER TERM, 1873.

## MILES *vs.* KING.

That an execution creditor has notice of an unrecorded mortgage does not affect a purchaser at Sheriff's sale under the execution of the mortgaged land, such purchaser being without notice.

Where a mortgage given in 1855 was duly recorded, as the law then of force directed, but—the record having been destroyed—was not again recorded, as the Acts of 1866 required, it is void as against a subsequent purchaser for valuable consideration without notice.

The Act of 1866, directing all instruments of writing which by law were required to be recorded, the records of which had been destroyed, to be again recorded within a time fixed by the Act, or else to be null and void as against subsequent purchasers for valuable consideration without notice, and creditors without notice, does not impair the obligation of contracts, and is a constitutional and valid law.

BEFORE FARMER, J., AT COLLETON, MAY, 1872.

This was an action by C. R. Miles and L. D. DeSaussure, against Samuel J. King, C. P. W. King and Caleb Sauls, to foreclose a mortgage of land.

The case was this : In the year 1854, Samuel J. King and C. P. W. King gave to Edward J. Parker their bond for $5,000, and on the 26th May, 1855, to secure the payment of the debt, they executed to Parker their mortgage of a tract of land in Colleton. The mortgage was duly recorded in June, 1855, and a few months afterwards Parker assigned both instruments to the plaintiffs. The record of the mortgage was destroyed in 1865, and it was not again recorded as directed by the Acts of 1866, which provided that "all instruments of writing of which a record or registry is required by law, and of which the record or registry is destroyed or lost, but the original preserved," shall be recorded by the 1st day of December, 1867, "otherwise they shall not prevail as liens against subsequent purchasers for valuable consideration without notice, nor creditors without notice," (13 Stat., 384, 411.) The original had been preserved.

When the mortgage was given the two Kings were seized of the tract of land, as tenants in common, each being entitled to one undivided moiety. On the 4th August, 1866, the undivided share of Samuel J. King was sold by the Sheriff under execution, in favor of Hull & Co., against Samuel J. King, and purchased by Caleb Sauls, who paid his bid and received a conveyance from the Sheriff. The debt, to satisfy which the sale was made, was contracted in 1860 and 1861. Sauls was a purchaser without notice. He alone answered the complaint, and he put his defense upon the ground that he was a purchaser of Samuel J. King's moiety, for valuable consideration, and without notice. His Honor sustained the defense, and made a decree for the sale of C. P. King's moiety.

The plaintiffs appealed, on the following grounds :

First. Because the plaintiffs' mortgage given for the purchase money, having been duly recorded in accordance with the provisions of the Act of 1843, became the paramount lien upon the mortgaged premises ; and Hull & Co., who became creditors of the mortgagor, Samuel J. King, in 1861, while the said record was in existence, were subsequent creditors, with notice of the mortgage ; and under the judgment recovered by them against the mortgagor could levy only upon his interest, subject to the mortgage, viz : the equity of redemption or right to redeem the mortgage.

Second. Because the defendant, Sauls, who purchased at the sale under Hull & Co.'s execution, obtained no greater rights, as

against the lien of plaintiffs' mortgage, than those of the plaintiffs in execution, who were subsequent creditors, with notice of the mortgage.

Third. Because the due registration of plaintiffs' mortgage was notice to all the world; and the defendant, Sauls, as well as Hull & Co., were affected with notice, and could never become "purchasers or creditors without notice;" and Sauls having purchased only the interest of the mortgagor levied upon under the judgment obtained by creditors with notice, is not "a purchaser for valuable consideration without notice," within the purview of the Acts of 1866.

Fourth. Because the Acts of 1866, according to their true construction, do not destroy the paramount lien of plaintiffs' mortgage, secured by due compliance with the requirements of the Act of 1843.

Fifth. Because, if such is the effect of the Acts of 1866, then their "provisions are so unreasonable as to amount to a denial of a right, and call for the interposition of the Court."

Sixth. Because the mortgagees, by compliance with the requirements of the Acts of the Legislature in relation to the recording of mortgages existing at the time of registration, acquired certain vested rights in the mortgaged premises, which could not be divested by any subsequent exercise of mere legislative will. And if the operation of the Acts of 1866 is to destroy, defeat or postpone rights so vested, then they "impair the obligation of a contract," and are unconstitutional, null and void.

*Tracy*, for appellants.

*Henderson & Behre*, contra.

The following is the opinion of

MOSES, C. J. Assuming that the mortgage was recorded in conformity with the Act of 1843, the points involved in the grounds of appeal draw in question the validity of the Acts of 1866, (13 Stat. 384, 411,) so far as they are held by the Circuit decree to affect it.

Sauls presents himself in the position of a subsequent purchaser for valuable consideration without notice, and it is an error on the part of the appellants to contend that the mortgage having been on record when Hull, in 1861, became the creditor of the mortgagor, S. J. King, the notice thus binding him must be held to extend to

the respondent, the purchaser. There is no connection between them. The equities existing between Hull, the creditor, and King, the debtor, in no way, either in an actual shape, or by implication, attach to the purchaser at Sheriff's sale, who takes his title, not *mediately*, but *immediately*, as is said in *McKnight* vs. *Gordon*, 9 Rich. Eq., 233. That case disposes of the argument that the purchaser at a Sheriff's sale was bound by the notice, which the creditor, under whose judgment the land was sold, had of the pre-existing mortgage, when the debt due him was contracted.

The main ground on which a reversal of the Circuit decree is claimed by the appellants is, that their mortgage having been recorded in conformity to the requirements of the Acts in force at the time of its execution, they acquired certain vested rights in the mortgaged premises, which could not be divested by any subsequent exercise of mere legislative will; and if the operation of the Acts of 1866 is to defeat, destroy or postpone rights so vested, then they amount to a denial of right, impair the obligation of a contract, and are unconstitutional, null and void.

The lien of a mortgage becomes operative through its own force. It is perfect and complete without the aid of confirmation by legislative authority. In *McKnight* vs. *Gordon*, (already referred to,) p. 231, it is said: "Recording is not an element in the due execution of a mortgage, and, therefore, is not essential to its validity." To prevent the mischief that would result to the public, if instruments, by the force of which property is transferred, particularly where no change of possession is required, the Legislature declared that although their effect may remain unchanged as to the parties, they should not prevail against subsequent creditors or purchasers for valuable consideration without notice, unless recorded in certain offices within a limited period. The mortgage acted by its own power from its execution, and we fail to see how the fact of recording it, in compliance with the provision then required by law, was so incorporated with it as to constitute a part of the contract, which the respective parties, as shown by the instrument, had entered into. The Legislature did not declare in the Act of 1843 that the notice which it therein fixed should forever remain unchanged, or by any implication bind itself, no matter what might be the necessity that intervened, not to provide by further interposition, for the prevention of the mischief which the Act of 1843 was designed to frustrate, should it prove ineffectual for the end in view.

But the General Assembly has power to divest vested rights, and to enact statutes retrospective in their action, provided they do not impair the obligation of a contract.—*Satterlie* vs. *Matthewson*, 2 Pet., 380; *Watson* vs. *Mercer*, 8 Pet., 110; *Charles River Bridge* vs. *Warren Bridge*, 11 Pet., 420; *Florentine* vs. *Bartow*, 2 Wal., 410.

In what respect, however, are the statutes of 1866 retrospective? While that of 1843 was effectual for the intended purpose, the conditions on which it should operate as notice remain unchanged. When it failed to meet the exigency for which it was adopted, all that the Legislature proposed by the Act of 1866 was to establish a mode by which, for the future, constructive notice of mortgages and other instruments, of which a registry had before been required, should be provided. This it did by directing that they should be re-recorded. It did not affect the past. When the Act of 1843 failed to accomplish its intended purpose through the destruction of the record books which contained the evidence of the notice, all that the Legislature proposed was to carry out the purpose of its enactment.

The notice which it required was to protect the public. Where would have been the protection, after the destruction of the registry books, to a proposed purchaser from the mortgagor? The original, if preserved, would remain in the hands of the mortgagee, without anything to put such purchaser to enquiry, and the whole community in the Counties where the books of the Register of Mesne Conveyance had been destroyed would have been in a state of inextricable confusion as to the title to their lands, without some legislation of the character of that of 1866.

What vested rights did the appellants acquire by recording their mortgage, according to the direction of the Act of 1843? It contained no stipulation that involved any prohibition against the State to require a compliance with any new regulations which it might impose to make the registration law more perfect, and certainly none which prevented it, when, by causes beyond its control, the provisions of the Act of 1843 ceased to effect the purpose contemplated by it, in the way of notice, from supplying the means by which notice of the mortgage of appellants should be given to the public.

But, as the authorities show, a vested right may be divested by the Legislature, unless it exists by virtue of, or in the nature of a contract. What elements of a contract enter into the registration

laws of a State? Surely, between the parties to a deed, there is no obligation that the grantee shall record it, for his omission to do so in no way impairs its validity against the grantor. The State is no party to it, and while it forbears to do anything which may infringe upon the obligation between the grantor and grantee imposed by the instrument on its execution, it remains without inhibition as to the change or modification of its registry regulations. A contract is an agreement or compact between two or more, expressed or implied, and for its support must rest on some consideration. Unless, therefore, the Acts of 1866 can be shown to impair some vested right, arising or growing out of a contract under the Act of 1843, their validity cannot be successfully assailed.

Mr. Cooley, in his treatise on Constitutional Limitations, referring to the power of legislation in regard to vested rights conferred by virtue of a contract, says at page 286 : "Such being the obligation of a contract, it is obvious that the rights of the parties in respect to it are liable to be affected in many ways by changes in the laws, which it could not have been the intention of the constitutional provision to preclude;" and quotes, as follows, the language of Mr. Justice Washington, in *Ogden* vs. *Saunders*, 12 Wheat, 259 : "There are few laws which concern the general police of a State, or the government of its citizens in their intercouse with each other, or with strangers, which may not in some way or other affect the contracts which they have entered into or may thereafter form. For what are laws of evidence, or which concern remedies, frauds and perjuries, laws of registration, and those which affect landlord and tenant, sales at auction, acts of limitation, and those which limit the fees of professional men and the charges of tavern keepers, and a multitude of others which crowd the Codes of every State, but laws which affect the validity, construction, or duration, or discharge of contracts." "But," proceeds Mr. Cooley, "the changes in these laws are not regarded as necessarily affecting the obligation of contracts."

Mr. Sedgwick, in his work on Statutory and Constitutional Law, p. 660, has not failed, in treating of the constitutional prohibition against interference with the obligation of a contract, to refer to its bearing on the recording laws of a State, and regards the question settled by the decision of the Supreme Court of the United States, in *Jackson, ex dem. Hart* vs. *Lamphire*, 3 Pet., 289. The point there made involved the effect of subsequent legislation in regard

to a land patent, granted to one Cornelius, who had conveyed title under it. In the course of the opinion of the Court, Mr. Justice Baldwin, at p. 90, says: "It is within the undoubted power of State Legislatures to pass recording Acts, by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time; and the power is the same, whether the deed is dated before or after the passage of the recording Act. Though the effect of such a law is to render the prior deed fraudulent and void against a subsequent purchaser, it is not a law impairing the obligation of contracts. Such, too, is the power to pass Acts of limitation and their effect. Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned. The time and manner of their operation, the exceptions to them, and the acts from which the time limited shall begin to run, will generally depend on the sound discretion of the Legislature, according to the nature of the title, the situation of the country, and the emergency which leads to their enactment. Cases may occur where the provisions of a law on those subjects may be so unreasonable as to amount to a denial of a right and call for the interposition of the Court, but the present is not one."

The doctrine of *Jackson* vs. *Lamphire* was referred to and applied in *Curtis* vs. *Whitney*, 13 Wal., 71. Under its authority it was there held, " that a statute which requires the holder of a tax certificate, made before its passage, to give notice to an occupant of the land, if there be one, before he takes his tax deed, does not impair the obligation of the contract evidenced by the certificate."

A review of the legislation of South Carolina, beginning long before the ratification of the Constitution of the United States, will show a succession of Acts in regard to the recording of conveyances, both of personal and real estate, enforcing changes and conditions, operating on those executed prior to the requirement of the new provisions. We will, however, confine ourselves to those enacted since the adoption of that instrument. On 13th March, 1789, 5 Stat., 127, the Legislature passed an Act whereby, after reciting a previous Act, which required the recording of conveyances of land in a prescribed time, and that, if not so recorded, should be void against creditors or subsequent purchasers, who had recorded their title according to its provision, that few or no mortgagees or purchasers had discovered the Act—and had failed to record according

to its requirements—it enacted that the instrument, though not so recorded, " shall be valid and sufficient in law," if recorded within twelve months from the date of its passage.

On the 5th of September 1792, 5 Stat., 203, an Act was passed, reciting the Act of 1785, which required marriage deeds and contracts to be recorded, and that it had been judicially held not to extend to those actually existing at its passage. Therefore, it enacted that those so existing and not recorded within eighteen months of the passage of the Act should be null and void as against creditors and *bona fide* purchasers and mortgagees.

On 20th of December, 1823, 6 Stat., 42, the Legislature declared by Act that no marriage settlement "shall be valid until recorded in the office of Secretary of State and Register of Mesne Conveyance of the District wherein the-parties reside: *Provided,* The parties shall have three months to record the same, and if not recorded in three months, the same shall be null and void."

In December, 1832, 6 Stat., 482, the Legislature declared " that marriage settlements of the wife's property, executed since said 20th of December, 1823, and not recorded, shall be regarded as valid between the parties." This very Act of 1843, which makes mortgages void as to subsequent creditors or purchasers for valuable consideration, if not recorded within sixty days after 1st of May, 1844, declares those void which shall not be recorded within sixty days of the 1st day of May, 1844, if executed previous to that day.

If these various Acts, which, in view of the argument for the appellant, affected vested rights supposed to be protected by the prohibition of the Constitution of the United States, it is strange that in the extended period of their existence no question has been ever made, in their practical operation, by or on behalf of creditors, purchasers, or even debtors, of the right of the Court to enforce them.

In the construction of the Act of 1843, and of all registration statutes, being remedial in their character, we must look to the mischief of the existing law, and the means which were supplied to prevent it. The evil was the want of notice of the lien of the mortgage, and the remedy was afforded by requiring it to be recorded in some public office, to which all might have access. While the books which contained the record could be reached, a source of notice was provided for the community. Where, as in the County of Colleton, they were destroyed, it was deprived of the notice they were intended to supply. The Statute ceased to secure the very object of its

enactment. The mortgagor was left without opportunity of detection or defeat, if he had been dishonestly disposed to sell, or encumber anew, the land he had already mortgaged, and the public were in the attitude of unprotected victims. The evil was not confined alone to the County in which this case originated, but the destruction by the war of so many recording offices throughout the State induced the Legislature to provide a security against double mortgages and deceitful conveyances, and this it did by the Acts of 1866. It was but a re-enactment of the provisions of the Act of 1843, extending them where the instrument was preserved, but the record of it destroyed, by requiring a re-recording between the 20th September, 1866, and the 1st day of December, 1867. In point of fact, the Legislature virtually said, the constructive notice by the Act of 1843 shall not avail, unless the instrument is re-recorded within a specified time. Should the appellants complain, when, by their omission to avail themselves of the benefit of the opportunity thus extended, they have placed Sauls in the position of a purchaser for valuable consideration without notice, when their compliance with the Acts would have not only protected them, but saved the innocent and unwary from a loss, which followed from their own omission to re-record their mortgage? It will be remembered that Sauls did not purchase until the 4th of August, 1868. Actual notice on his part was not proved, and the appellants failed to afford him the constructive notice which the law gave them the opportunity of imparting. Mr. Justice Story, in his Equity Jurisprudence, Section 403, says: "In America it is uniformly held that the registration of a conveyance operates as constructive notice to all subsequent purchasers of any estate, legal or equitable, in the same property. The reason upon which this doctrine is founded is the obvious policy of the registry Acts, the duty of the party purchasing under such circumstances to search for prior incumbrances, the means of which search are within his power, and the danger (so forcibly alluded to by Lord Hardwicke) of letting in parol proof of notice, or want of notice of the actual existence of the conveyance." In what possible way can Sauls be said to hold the attitude of a purchaser with notice? and if he does not, he is entitled to the benefit of his purchase.

The motion is dismissed. It is necessary, however, as the time fixed for the sale of the other moiety of the mortgaged premises, which, it is admitted, is bound by the mortgage, being the share of

the said C. P. W. King, has passed, to remand the case to the Circuit Court, that its further order may be had for such sale. It is so accordingly ordered.

The following is the opinion of

WILLARD, A. J. We fully concur in the opinion that the fact of having complied with the provisions of the registration Act, in force at the time of the making of the mortgage in ·suit, does not constitute a contract as between the mortgagee and the State, and the subsequent enactment of a law requiring a second Act of registration cannot be regarded as tending to impair the obligation of any such contract.

The real question is, whether the enactment of a law requiring the re-registration of mortgages already in operation, and registered in conformity with the laws in force at its inception, and validating the title of subsequent purchasers and judgment creditors in case of a neglect so to record, tends to impair the obligation of a contract. We do not question the power of the Legislature to pass laws requiring instruments already in existence to be recorded, or to provide suitable penalties in case of a failure to comply with such requirements. The question here arises out of the nature of the penalty imposed. It is, whether it does not disturb the relations between the mortgagor and mortgagee as settled by the mortgage. On this point we yield with reluctance to the authority of the Supreme Court of the United States, as expressed in *Jackson* vs. *Lamphire*, (3 Pet., 289). That Court may feel at liberty to treat the question as still open, in view of the fact that the registration laws were not before the Court in that case, nor in *Curtis* vs. *Whitney*, (13 Wall., 68); but this Court is bound to give weight to the fact that the legislation of this State on this subject has been shaped upon the views expressed in regard to registration laws in *Jackson* vs. *Lamphire*, and also to the consideration that doubtful constructions of clauses of the Constitution of the United States, limiting the powers of the States, should generally be solved by the State Courts in favor of those powers, and always so solved where the general doctrines advanced by the Supreme Court of the United States appear to sanction such a course. We do not, therefore, feel at liberty to follow the convictions of our own minds on this subject.

To validate the title and claim of a subsequent purchaser or creditor is, in effect, to give power to the mortgagor, to affect the mortgaged pemises by his act and deed in a manner inconsistent with the legal effect of his mortgage. We cannot see how an Act of the Legislature can have this effect on an antecedent contract, either executory or executed, consistently with the Constitution, whether as a consequence of the failure of the holder of a mortgage to comply with laws requiring the registration of such mortgage, or for any other reason. Laws like that under consideration, requiring the performance of certain acts by an individual, for the exclusive benefit of the community, and in which the party bound to perform has no interest, and attended by a forfeiture of estates as a conseqence of a neglect to conform therewith, push the rights of the community, as against the individual, to the utmost limit. If such a construction and operation might be given to the clause of the Constitution as would tend to restrict the sphere of such legislation, it would add greatly to the security of property, without limitimg unduly the legitimate means of compelling conformity to law in the hands of the Legislature of the State.

For the reasons above stated, we are compelled to concur in upholding the statute in question.

*Wright,* A. J., concurred.