## Burns v. Paulak

Paul Reap Bohan and Joseph A. Keough, for plaintiff.

I. Finkelstein, for defendant.

Frank F. Truscott, City Solicitor, and Abraham Wernick and Maurice Mordell, Assistant City Solicitors, for the City of Philadelphia, Amici Curiæ.

CRUMLISH, J., March 8, 1948.—The above-captioned matter is before us on defendant's petition for rule to show cause why a stay of proceedings should not be granted. It is defendant's contention that execution was issued contrary to an order of the City Housing Rent Commission.

On December 15, 1947, judgment for possession was entered by virtue of a confession of judgment contained in a written lease between the parties. During the month of December 1947 plaintiff applied to the City Housing Rent Commission, of the City of Philadelphia, for relief under the provisions of an ordinance passed by city council and approved by the mayor on August 13, 1947 (and as amended September 30, 1947). In accordance with the provisions of the said ordinance, the commission held a hearing and entered an order directing plaintiff not to institute any eviction proceedings until May 15, 1948. Despite the order of the city housing rent commission, plaintiff caused judgment to be entered and on the following day issued execution thereon.

This proceeding is an attack on the constitutionality and validity of the aforementioned rental control ordi-

nance. It is assailed on a number of grounds, which may be summarized as follows:

1. The ordinance does not give any control to the commission.

2. The ordinance is not the exercise of police power, because

(a) The legislature has not and cannot delegate the exercise of police power to a municipality; and

(b) There is no emergency calling for the exercise of the police power.

3. The ordinance is invalid because it adjudicates rights of property and impairs the obligations of contracts.

4. The ordinance is invalid as being in contravention of a legal order entered by the Federal rent director.

We shall take up these contentions seriatim.

### 1. *The Ordinance Does Not Give Any Control to the Commission*

The wording of the ordinance has been criticized, and it must be admitted that its language could be improved. However, the main intent of it seems to be clear. Section 4 provides that when a landlord is seeking to evict a tenant, except under certain conditions, he must give at least six months' notice before instituting legal proceedings. Section 6 provides for the creation of the rent commission and provides that it shall hear all cases of disputes between landlord and tenant, and "shall upon hearing, render such decision or enter such order as it may deem just and equitable", which in our opinion does not mean free hand to the commission to order anything it may see fit, but merely to decide whether or not the terms of the ordinance are complied with. Section 9 imposes penalties for refusal to comply with the decision or order of the commission. When we consider all of these provisions together, it appears that the main point is that there

shall be no eviction except upon at least six months' notice in those cases where notice is required. From the whole of the ordinance, it is apparent that the intent of council was that there shall be no eviction proceedings in cases of the instant type unless at least six months' written notice has been given, and the commission has merely the duty of determining this fact and entering the appropriate decision. It is, therefore, apparent that the power of the rent commission has been fully established by the ordinace.

2(a). *The Legislature Has Not and Cannot Delegate the Exercise of Police Power to a Municipality*

Plaintiff takes the extreme position:

"In other words, not only does the city council have no authority whatsoever under the Constitution to enact legal governing procedure for the enforcement of property rights but the General Assembly would have no such power to enact a local, special law or to delegate its power to enact legislation such as the ordinance in this case."

In support of this position, plaintiff cites and relies upon article III, sec. 7, of the State Constitution of 1874, which provides:

"The General Assembly shall not pass any local or special law: . . . Regulating the practice or jurisdiction of, or changing the rules of evidence in, any judicial proceeding or inquiry before courts, aldermen, justices of the peace, sheriffs, commissioners, arbitrators, auditors, master in chancery or other tribunals, or providing or changing methods for the collection of debts, or the enforcing of judgments, or prescribing the effect of judicial sales of real estate: . . ."

With regard to the Commonwealth's authority, we quote from Commonwealth v. Vrooman, 164 Pa. 306, 315, 316 (1894), where it was said:

"The general character of the police power is well understood, although neither the text books nor de-

cided cases have yet given us an adequate definition of it. Little more has been attempted by the courts of this country than to determine that a particular subject does or does not fall within the range of this power. An illustration is afforded by the Beer Co. v. Massachusetts, 97 U. S. 25, in which this language was used: 'However difficult it may be to render a satisfactory definition of it (the police power) there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals.' Blackstone in his Commentaries, vol. 4, p. 162, describes this power as the power of 'public police and economy', by which the internal regulation and good order of the state is secured, and individual citizens, like the members of a well ordered family, are made to conform their conduct to the rules of propriety, good neighborhood and good manners. It is therefore a power inherent in all forms of government. Its exercise may be limited by the frame or constitution of a particular government, but its natural limitations, in the absence of a written constitution, are found in the situation and necessities of the state, and these must be judged of in the first instance by the government itself. It corresponds to the right of self-preservation in the individual. When the dangers that threaten the state come from without, the right of self-preservation is exercised in gathering armies and the means of public defense. When the dangers arise within the state, self-preservation requires their suppression. This is accomplished by the exercise of the police power which deals with all forms of disorder, and provides for the public welfare, and the protection of citizens against the violence and the fraudulent conduct of each other."

There is no express limitation upon the exercise of the police power in the Constitution of the Commonwealth of Pennsylvania.

As to the delegation of a part of the police power to a municipal corporation, the general rule is:

"The police power primarily inheres in the state, but if the state constitution does not forbid, the legislature may delegate a part of such power to the municipal corporations of the state, either in express terms or by implication, or to other subordinate subdivisions or state agencies, to be exercised concurrently with the state, or exclusively, without state intervention, or the state constitution may vest in municipalities, or other duly constituted public agencies, the authority to exercise specified portion of such power. By virtue of clear grant by the state, the police power may be exercised on the same subject matter by the state and by the municipality": McQuillin Municipal Corporations (2d ed.), sec. 949, vol. 3, p. 108.

Article XV, sec. 1 of the Constitution of 1874, provides:

"Cities . . . may be given the right and power . . . to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature: . . ."

In Lesley v. Kite, 192 Pa. 268 (1899), cited and relied on by plaintiff, our Supreme Court, speaking through Chief Justice Sterrett, said at p. 274:

"Nothing is better settled than that a municipal corporation does not possess and cannot exercise any other than the following powers: (1) those granted in express words; (2) those necessarily or fairly implied in or incident to the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable. Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied: Dillon on Municipal Corporations, sec. 89."

Having demonstrated that the exercise of the police power by the legislature is not curtailed by article III, sec. 7, and that that body may delegate a part of the police power to a municipality, we turn to the question of whether or not there has been such a delegation to the City of Philadelphia as would warrant the adoption of the ordinance under consideration. The Act of March 11, 1789, 2 Sm. L. 462, sec. 16 (53 PS §6364) entitled "An Act to Incorporate the City of Philadelphia", being the first charter granted by the Commonwealth to the city, provided in section XVI:

"That the Mayor, Recorder, Aldermen and Common Councilmen, in Common Council assembled, shall have full power and authority to make, ordain, constitute and establish, such and so many laws, ordinances, regulations and constitutions, (provided the same shall not be repugnant to the laws and constitution of this Commonwealth,) as shall be necessary or convenient for the government and welfare of the said city, and the same to enforce, put in use, and execution, by the proper officers, and at their pleasure to revoke, alter and make anew, as occasion may require."

Section XLIV of the Act of 1789, supra, further provides:

"And be it further enacted by the authority aforesaid, That as often as any doubts shall arise touching this act, the same shall, in all courts of law and equity, and elsewhere, be construed and taken most favourably for the said corporation."

In 1897 the Supreme Court, in Commonwealth v. Walton, 182 Pa. 373, held (p. 376):

"By the act of March 17 [11], 1789 (supra), which appears to be still in force, the city councils of Philadelphia 'have full power and authority to make, ordain and establish such and so many laws, ordinances and regulations as shall be necessary for the welfare and comfort of the city'. We have no right to assume, nor is there anything from which it may be fairly inferred

that the constitutional prohibition in question was intended to revoke or curtail any of the powers or authorities with which the city councils were theretofore invested by the comprehensive grant above quoted."

As late as 1928, our brother Smith, in Cushman v. Penna. Museum and School of Industrial Art, 10 D. & C. 316 (1928), speaking for the Court of Common Pleas No. 5 of Philadelphia, held that the Act of March 11, 1789, supra, was still in force and was not affected by the Constitution adopted in 1874. We are of the opinion that the Act of March 11, 1789, supra, is still in force.

Furthermore, it is provided in the Philadelphia City Charter Act of June 25, 1919, P. L. 581, art. XVI, sec. 1 (53 PS §3251):

"From and after the first Monday of January, one thousand nine hundred and twenty, the legislative branch of the government of each city of the first class shall consist of a city council elected as hereinafter provided. Such council shall have and exercise all the legislative power of such city and all powers and duties theretofore had and exercised by the previously existing legislative branch of government in such city, whether the same were had and exercised by a single chamber, or by two chambers acting jointly or concurrently, or by either of them acting separately. It is the intention of this act that the council herein provided for shall take the place of the council or councils existing in any city of the first class at the date aforesaid or in any city when it may hereafter become a city of the first class, but that the powers, duties, and functions of the legislative branch of the city government shall continue unchanged except as herein provided or as may be hereafter provided by law: . . ." Thus, we find the authority conferred on the "Common Council assembled" by the Act of 1789, passed on and perpetuated in the councilmanic body which passed the ordinance under consideration.

2(b). *There Is No Emergency Calling for the Exercise of the Police Power*

Modern conditions of society are constantly presenting new problems to be solved by the courts. Legislation designed to alleviate the distress and to improve the general welfare of a community should be liberally construed by the courts. That there is a current acute housing shortage cannot be questioned, nor can it be denied that regulations are needed to protect the welfare of the members of the community affected thereby. The ordinance under consideration is undoubtedly designed for this purpose. We had a situation immediately succeeding the close of hostilities of World War I, and before peace had been finally signed, which is similar to our condition today. At that time the Supreme Court of the United States and practically all courts, where the question arose, decided that an emergency existed. In Marcus Brown Holding Co., Inc., v. Feldman et al., 256 U. S. 170, 65 L. ed. 877, defendant relied upon an act of the New York Legislature (C 942 Laws of 1920), which declared a public emergency to exist and provided that summary proceedings could not be maintainable to recover possession of real estate occupied for dwelling purposes in a city of a population of 1,000,000 or more, and so forth, except under certain circumstances, and plaintiff assailed such statute as unconstitutional. Justice Holmes, speaking for the Supreme Court of the United States, said (p. 198):

"The chief objections to these acts have been dealt with in Block v. Hirsh (256 U. S. 135). In the present case more emphasis is laid upon the impairment of the obligation of the contract of the lessees to surrender possession and of the new lease which was to have gone into effect upon October 1, last year. But contracts are made subject to this exercise of the power of the State when otherwise justified, as we have held this to be: Manigault v. Springs, 199 U. S. 473, 480.

Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 482. Chicago & Alton R. R. Co. v. Tranbarger, 238 U. S. 67, 76, 77. Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U S. 372, 375. Producers Transportation Co. v. Railroad Commission of California, 251 U. S. 228, 232. It is said too that the laws are discriminating, in respect of the cities affected and the character of the buildings, the laws not extending to buildings occupied for business purposes, hotel property or buildings now in course of erection, &c. But as the evil to be met was a very pressing want of shelter in certain crowded centers the classification was too obviously justified to need explanation, beyond repeating what was said below as to new buildings, that the unknown cost of completing them and the need to encourage such structures sufficiently explain the last item on the excepted list."

In Block v. Hirsh, supra, defendant declined to surrender possession, relying upon the Act of October 22, 1919, c-80, title II, "District of Columbia Rents"; especially sec. 109, 41 Stat. at L. 297, 298, 301. By section 109 of the act the right of a tenant to occupy any hotel, apartment, or "rental property", i. e., any building or part thereof, other than hotel or apartment, is to continue notwithstanding the expiration of his term, at the option of the tenant, subject to regulation by the commission appointed by the act, so long as he pays the rent and performs the conditions as fixed by the lease or as modified by the commission. The act was assailed as being unconstitutional as an attempt to authorize the taking of property not for public use and without due process of law. Mr. Justice Holmés, speaking for the Supreme Court of the United States, said (p. 155):

"The general proposition to be maintained is that circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law. Plainly circumstances may so change in time or so differ in space as to clothe

with such an interest what at other times or in other places would be a matter of purely private concern. It is enough to refer to the decisions as to insurance, in German Alliance Insurance Co. v. Lewis, 233 U. S. 389; irrigation, in Clark v. Nash, 198 U. S. 361; and mining, in Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527. They sufficiently illustrate what hardly would be denied. They illustrate also that the use by the public generally of each specific thing affected cannot be made the test of public interest, Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Inter-State Power Co., 240 U. S. 30, 32, and that the public interest may extend to the use of land. They dispel the notion that what in its immediate aspect may be only a private transaction may not be raised by its class or character to a public affair. See also Noble State Bank v. Haskell, 219 U. S. 104, 110, 111. The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less concretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay. Under the police power the right to erect buildings in a certain quarter of a city may be limited to from eighty to one hundred feet. Welch v. Swasey, 214 U. S. 91. Safe pillars may be required in coal mines. Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531. Billboards in cities may be regulated. St. Louis Poster Advertising Co. v. St. Louis, 249 U. S. 269. Watersheds in the country may be kept clear. Perley v. North Carolina, 249 U. S. 510. These cases are enough to establish that a public exigency will justify the legislature in restricting property rights in land to a certain extent without com-

pensation. But if to answer one need the legislature may limit height to answer another it may limit rent. We do not perceive any reason for denying the justification held good in the foregoing cases to a law limiting the property rights now in question if the public exigency requires that. The reasons are of a different nature but they certainly are not less pressing. Congress has stated the unquestionable embarrassment of Government and danger to the public health in the existing condition of things. The space in Washington is necessarily monopolized in comparatively few hands, and letting portions of it is as much a business as any other. Housing is a necessary of life. All the elements of a public interest justifying some degree of public control are present. The only matter that seems to us open to debate is whether the statute goes too far. For just as there comes a point at which the police power ceases and leaves only that of eminent domain, it may be conceded that regulations of the present sort pressed to a certain height might amount to a taking without due process of law. Martin v. District of Columbia, 205 U. S. 135, 139." See also, Levy Leasing Co., Inc., v. Siegel, 258 U. S. 242, 66 L. ed. 595; People ex rel. Durham Realty Corp. v. LaFetra, 230 N. Y. 429, 130 N. E. 601; Clemilt Realty Co. v. Wood, 230 N. Y. 646, 130 N. E. 928; 810 West End Ave. v. Stern, 230 N. Y. 652, 130 N. E. 931; People ex rel. Rayland Realty Co. v. Fagan, 194 App. Div. 185, 186, N. Y. Supp. 23; People ex rel. H. D. H. Realty Corp. v. Murphy, 194 App. Div. 530, 186 N. Y. Supp. 938.

3. *The Ordinance Is Invalid Because It Adjudicates Rights of Property and Impairs the Obligation of Contracts*

This objection would be well taken if the police power sought to be exercised was arbitrarily, unreasonably or patently beyond the necessities of the case. But this qualification does not apply in the instant case as we have already pointed out. The objection

stripped of its qualification is untenable both under the decisions of our own State courts and the Federal courts. In Adinolfi v. Hazlett, 242 Pa. 25, 30 (1913), it was held: "While the legislature may not interfere with the absolute individual right to contract, except on the ground of public policy, it may of course regulate the manner in which that right shall be exercised." In Commonwealth v. Stofchek, 322 Pa. 513, 519 (1936), it was held:

"But, the State possesses inherently a broad police power which transcends all other powers of government. There is therefore no unqualified right to acquire, possess, and enjoy property if the exercise of the right is inimical to the fundamental precepts underlying the police power. This court said in Commonwealth v. Widovich, 295 Pa. 311: 'The police power is the greatest and most powerful attribute of government; upon it the very existence of the State depends. . . . If the exercise of the police power should be in irreconcilable opposition to a constitutional provision or right, the police power would prevail.' It needs no constitutional reservation or declaration to support it: City of Scranton v. Public Service Commission, 268 Pa. 172. And see Powell v. Commonwealth, 114 Pa. 265, in which the Act of May 21, 1885, P. L. 22, making manufacture, sale, and possession with an intent to sell of oleomargerine unlawful, was upheld as a valid exercise of the power. One of its well known objects is the protection of public health, and laws prohibiting the import, export, sale or transfer of articles deleterious to the public, such as intoxicating liquors are valid under it: Bartemeyer v. Iowa, 18 Wall. 129; Mugler v. Kansas, 123 U. S. 623; Silz v. Hesterberg, 211 U. S. 31; Commonwealth v. Gardner, 297 Pa. 498. What the State can prohibit entirely, it can regulate. See Eberle v. Michigan, 232 U. S. 700; Commonwealth v. Vigliotti, 271 Pa. 10, affirmed Vigliotti v. Commonwealth, 258 U. S. 403;

In re Hoover, 30 Fed. 51." See also, Burke et al. v. Bryant et al., 283 Pa. 114 (1925). See Commonwealth v. Beatty, 15 Pa. Superior Ct. 5, 15 (1900), where it was held:

"The police power of the state is difficult of definition, but it has been held by the courts to be the right to prescribe regulations for the good order, peace, health, protection, comfort, convenience and morals of the community which does not encroach on a like power vested in congress or state legislatures by the federal constitution, or does not violate the provisions of the organic law; and it has been expressly held that the fourteenth amendment to the federal constitution was not designed to interfere with the exercise of that power by the state: Powell v. Penna., 127 U. S. 678; Powell v. Com., 114 Pa. 265. Its essential quality, as a governmental agency is that it imposes upon persons and property burdens designed to promote the safety and welfare of the public at large. The principle that no person shall be deprived of life, liberty or property, without due process of law, was embodied in substance in the constitutions of nearly all, if not all, of the states at the time of the adoption of the fourteenth amendment, and it has never been regarded as incompatible with the principle, equally vital because equally essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community: Boston Beer Co. v. Massachusetts, 97 U. S. 25."

In the leading case of Mugler v. Kansas, 123 U. S. 623, 31 L. ed. 205, the State Prohibition Law was sustained against the objection that it rendered stocks of liquors valueless, and thus impaired the obligation of contracts for the manufacture and sale of liquors. See also, Home B. and L. Assn. v. Blaisdell et ux., 290 U. S. 398; Marcus Brown Holding Co. v. Feldman et al., supra; Levy Leasing Co., Inc., v. Siegel, supra;

Nebbia v. People of State of New York, 291 U. S. 502, 78 L. ed. 940 (opinion by Justice Roberts).

### 4. *The Ordinance Is Invalid as Being in Contravention of a Legal Order Entered by the Federal Rent Control Director*

Admittedly, the State of Pennsylvania or the City of Philadelphia could not violate an act of Congress or an order of a Federal commission entered in pursuance of the act. But in the instant case there is no conflict. Section 4 of the ordinance provides that it merely supplements the terms and provisions of the Federal Housing and Rent Act of 1947. Under the Federal act, permission had to be given by the Federal rent officer before an eviction could take place, but the mere fact that the Federal officer found that the eviction would not violate the Federal Rent Control Act does not mean that the Federal law prevents the city's commission from determining whether an eviction may be had and under what circumstances. In effect, all that the Federal officers said was: "If you comply with our order, we have no further interest in the matter. You may go ahead so far as we are concerned." The parties would therefore be relegated to their rights under local law, viz.: The provisions of the ordinance under consideration. See "State Rent-Control Legislation, 1946-1947", Yale Law Journal, vol. 57, 372, note 104.

There remains for consideration one final contention on the part of plaintiff. He contends that prior to the entry of the judgment six months' notice had been given to defendant, and that this fact appears in the affidavit of default filed with the order for judgment. Plaintiff has filed no answer and the fact does not appear in the petition before us. However, an examination of the averment of default discloses the allegation "that on November 8, 1947, plaintiff served upon defendant written notice of the termination of said lease as of the end of the monthly term ending

December 14, 1947. . . ." Under the circumstances we can only conclude that plaintiff did not prove notice before the commission, or it found against him. It was the duty of the commission to pass upon the question of whether or not notice, if necessary, had or should have been given, and its decision being unappealed from, cannot now be collaterally attacked.

Accordingly, defendant's rule to stay the proceedings until May 15, 1948, and to set aside the writ of hab. fa. and fieri facias, is made absolute.